Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice John Griffin presiding, case number 1-9-2255, Richard Chappelle versus Board of Trustees of Illinois Municipal Retirement Fund. Welcome, welcome everyone. Would the attorneys who are going to argue please state your name and spell your last name? Yes, Vladimir Shuliga, last name spelled S-H-U-L-I-G-A. On behalf of the Defendant Appellants, Board of Trustees of the Illinois Municipal Retirement Fund. Good afternoon, Patrick Deedy, spelled D as in David, E-A-D-Y, on behalf of the River Forest Township. Good afternoon, Jerome Marconi, M-A-R-C-O-N-I, on behalf of Richard Chappelle. Now, Mr. Deedy, it's my understanding that you didn't file that the township was going to argue at this orally. I believe we filed a judge. If I apologize, I was under the, I got a notice that we had submitted it. I think we received it at the, and actually my office was in touch with the clerk about scheduling, so I'm not sure that, I apologize if that's the case, and I'll argue portion of the appellate argument time today. Well, we, each side gets 20 minutes. Have you talked to Mr. Shuliga about? Yes, Your Honor, we have. We've talked about it earlier this week. Oh, okay. Well, what did you guys agree to? Mr. Shuliga was going to start off, and Judge, he was going to take 12 of the 20 minutes, and I was going to have eight, and we would ask for some time for rebuttal. How much you want for rebuttal? Five minutes each. Okay, if that's what you're planning on, that's fine. Okay, I guess that's it. We can get started. Thank you. Mr. Shuliga. Thank you. Good afternoon. As I mentioned, my name is Vladimir Shuliga. I represent the defendant appellants in this case of the Board of Trustees of the Illinois Municipal Retirement Fund. Before I get into the substance of my argument, I did want to just note for the record that IMRF objects to the recent motion filed by Mr. Marconi. I know that we're still within the timeframe for filing a response under the Supreme Court rules, but since we are holding argument, I did want to make that objection for the record because that evidence wasn't presented at the administrative level or the circuit court level. But with that, I will jump into the evaluate and determine. The first is whether the IMRF Board of Trustees has jurisdiction to correct a retirement benefit paid in error and recover any overpayment of benefits. And then the second is even if it has jurisdiction, does equitable estoppel prevent the board from doing so? And due to the limited time that I have before this court, I am going to rest on the briefs with regard to the equitable estoppel argument. I think there is a lot of overlap in the issues, and I think they're laid out well in the briefs. So I will defer to the briefs on that issue unless the court has any questions specific to equitable estoppel. With that, I will turn to the jurisdictional issue, which I do believe has two components to it. The first is a threshold issue of whether the IMRF Board even rendered a final administrative decision regarding the 2002 application for omitted service credit. And then the second is even if there was a final decision, does the IMRF Board have the authority to correct that decision notwithstanding the finality of it? On the issue of whether a final administrative decision was rendered, I think the structural differences between IMRF and the downstate police and firefighter pension funds is paramount in this case. And the circuit court simply kind of brushed those distinctions aside and said that the pension code is the pension code, and regardless of which article is applied, it doesn't matter. But I think the facts of this case really highlight those differences, and those structural differences really inform everything else in this case. All of the downstate police and firefighter pension funds in Illinois are single employer pension funds. IMRF is a multi-employer pension fund which administers benefits for over 3,000 employers throughout the state. Each of the downstate police and firefighter pension funds have a five-member board of trustees. All of the trustees are related to that individual employer. IMRF has one board, eight members for all 3,000 participating employers. For police and firefighter pension funds, the boards administer the fund itself. For IMRF, there's a full-time staff which administers benefits. And in recognizing the difficulty in administering benefits for a multi-employer pension fund, the legislature keenly included what's called an authorized agent at every IMRF participating employer. That authorized agent is an individual responsible for representing the participating employer to IMRF with regard to IMRF issues. And that role plays a vital, that person played a vital role in the facts of this case. You won't find an authorized agent in any of the downstate police or firefighter pension funds because all of the boards of trustees are so intimately familiar with that individual employer. Now turning to the facts of this case, I think those administrative differences are going to be highlighted. Prior to 2002, Mr. Chappelle wasn't employed by the township. The River Forest Township is a participating employer and has been at all times relevant to this case. The River Forest Community Center is not an IMRF participating employer and never has been. When the township hired Mr. Chappelle in 2002, they properly enrolled him. He was an employee, he worked the necessary hours, it was proper to credit. Omitted service credit is a type of service credit in which for whatever reason, an individual who was required to participate wasn't enrolled. So it's correcting a past error. And the statutory requirements for omitted service credit requires that the authorized agent of the employer certify the eligibility for that service credit. And that happened in this case. In 2002, when the application was submitted, the authorized agent for the township certified that Mr. Chappelle was an employee of the township for all the months in dispute, 1986 to 2002. And we know today that that was not true. That was the error in this case. But at the time, and based on the structure of IMRF, IMRF accepted that representation by the township authorized agent. Now Mr. Chappelle argues that IMRF was actively involved in the evaluation of the position. There's simply no evidence of that in the record. The evidence is that he has procedural questions. He said, what are the forms and how does it work? And an IMRF staff member told him, here are the forms, and they have to be certified by the employer. The employer has to tell IMRF that you qualify for the omitted service credit. That's what happened in this case. And the distinction between the IMRF board versus IMRF staff is very important here because under section 7-2, 220 of the Illinois pension code, only final decisions by the board of trustees are subject to the administrative review law. And there's simply no evidence in the record that the board of trustees took any action on an omitted service credit application in 2002. This set of facts would never have arisen in a downstate police or downstate firefighter pension fund because Mr. Chappelle would have gone directly to the board of trustees because they're the administrators of the fund and would have said, I'd like omitted service credit. And they would have said that they being intimately familiar with the employer would have known that he was not an employee and the issue would have been resolved there. But being in a multi-employer public pension system, IMRF is set up to rely on the representations of the employer. So each of the downstate police and firefighter pension cases that the circuit court relied on are simply inapplicable in this case. The more appropriate analogy are the two cases involving IMRF with nearly identical facts, the Cloman case and the Billick case. In both of those cases, the employer made one representation to IMRF, which IMRF accepted, and then the employer made a different representation. And then IMRF held a hearing and corrected the first decision. In Cloman, the employer provided information. This was also about omitted service credit for a village attorney. Then it gave additional information to IMRF saying that he wasn't an employee. And when the court evaluated the exact same argument that Mr. Chappelle made, the court in Cloman concluded that first decision was a rubber stamp of the employer representation. It wasn't a final administrative decision. The same thing happened here. There was no final administrative decision. IMRF staff accepted information from the employer and implemented it. In 2017, when the employer came back to IMRF, IMRF had new information, had new information to reach the conclusion that Mr. Chappelle was not an employee for the months in question. And under Billick, it's a similar set of facts. The employer provided some information, then it changed that information to IMRF. Now in Billick, the plaintiff argued that they were bound, that the court and IMRF were bound by the prior decision. And the court said neither the employer nor IMRF can expand the terms of the pension code. It's the pension code that determines the eligibility for omitted service credit. And in this case, the requirement for omitted service credit is whether the individual was employed by a participating employer and should have been enrolled at that time. So even if there was a final administrative decision, the Billick court says that it's void. IMRF itself can't expand the terms of the pension code. The employer can't do it and IMRF can't do it. And that's an excellent transition to the second issue, the second component of the jurisdictional issue. Even if there was a final administrative decision in 2002, which IMRF disputes that there was, the IMRF still has under article seven of the pension code to correct those decisions. Now implicitly in section 7-179, IMRF has the authority to grant and suspend benefits. So in order to suspend a benefit, it has to be granted first. So there's got to be two actions there, but more importantly, and more on point, I think it's section 7-217C, which allows the board of trustees to withhold any or all of an annuity to recover money that was paid through misrepresentation, fraud or error. Now in evaluating that language, the circuit court applied the Rossler definition of error, the Rossler versus Morton Grove Police Pension Fund case, in which the court defined error as an arithmetical error. That's the only issue that could be corrected if there's a mathematical error. And this court has since rejected Rossler. In Kosakowski, this court said that the Rossler court engrafted limitations on the term error, which the legislature did not intend. And the Kosakowski court applied the plain and ordinary meaning of error. It's essentially a mistake. Some assertion was made that did not align with objective reality. Now in this case, Mr. Chappell says that there was no error. IMRF did exactly what it intended to do in 2002 when it gave 198 months of omitted service credit to a non-employee of the township. Now that cannot be true. The township had told... Counsel, isn't this case different though to the extent that you're comparing it to the other case? But in that case, that was an attorney who was an independent contractor who also was, I believe, an expert on pension law. This is basically a lay person, a non-lawyer. And also, he was an employee of an organization that could have been a member of the pension fund. So doesn't that make this case different? I don't think it does, Your Honor, because the statutory requirement for omitted service credit is not for an individual who worked for an employer who could have been a participating employer. It has to be an employee who was an employee of a participating employer. And secondly, the fact that the authorized agent for the township certified the eligibility is also problematic. Because what is she certifying? She's certifying that he was an employee of the township. So the potential for participation is not the same thing as being entitled to participation. Similarly, I don't think that there's no distinction in the pension code. But the question is, was she certifying that he was an employee of the township, or was she simply certifying that he would otherwise be eligible for benefits? And that's the point, Your Honor. The only way that he could have been eligible for benefits is to be an employee of the township. And similarly, IMRF nor the pension code asks an authorized agent of one employer to certify facts for another employer. So fundamentally, and what was certified was the eligibility with that employer to participate. So the authorized agent for the township absolutely had to certify that he was eligible. At the time, though, the township was a current employer. Yes. Okay. So therefore, the certification was for an employee of the employer. So you have to look at what the township was certifying. In 2002, and this is not disputed, in 2002, Mr. Chappelle was absolutely an employee of the township, and he was properly enrolled. But she was certifying something called omitted service credit, which certifies a past time from 1986 to 2002, at which point he was an employee of the community center, not of the township. So between 1986 and 2002, and this is not disputed, he was not an employee of the township, and he was not an employee of any other entity that was eligible for IMRF participation. And so did the township representative also certify that the payroll records of the township conform to the statement that he was an employee of the township during the prior year service? Yes, Your Honor, that's exactly right. And we know, it's agreed, that he was not an employee of the township from 1986 to 2002, and he was not paid by the township during that period of time, correct? That's exactly right, Your Honor. So she was certifying his employment with the township, which was mistaken, and his payment of salary or wages by the township, which was mistaken, correct? That's correct. And it was based upon that certification that the IMRF granted him 198 months prior service credit, right? Correct, that's correct, Your Honor. And in 2017, IMRF got new information. The township told IMRF this was not true, and so that was the error in this case, the error that authorizes IMRF to make the correction under 7-217C. Now, I'm into my colleague's time, so I do want to wrap up and just say that the circuit court erroneously concluded that the IMRF board does not have jurisdiction to correct a benefit paid in error, and there was plainly an error in this case, and it's not disputed that he was not an employee of the township between 1986 and 2002. So this court should reverse the circuit court decision and affirm IMRF board's administrative decision removing the 198 months of omitted service credit. Thank you. Thanks. Good afternoon, again, for the record. Patrick Dede on behalf of the township of River Forest. I am, like Mr. Shaliga, going to confine my discussion to the portion of the brief involving my brief involving the equitable stop a claim and going to rely upon primarily Mr. Shaliga's argument with respect to the jurisdictional issue and the authority of the board to make the correction in the service credit. This is an unusual case in the sense that the court's not presented with findings of the law that were made by the board in this case that really are, you know, considered to be at issue here because primarily the thing that occurred both with respect to the equitable stop a claim as well as the jurisdictional claim with respect to the final administrative decision is that neither of those issues were raised by the plaintiff in this case in the administrative hearing. So there was no determination, for instance, as to whether or not this 2002 acceptance was a final decision, which would have been the case if that had been raised. And also there's no determination with respect to that in terms of whether or not the section of the pension code that Mr. Shaliga referred to, section 217C, was actually permitted the board to make that correction in the air. I guess for purposes of this discussion, however, there are several facts that the court, I think, and Justice Pierce has mentioned that are really not in dispute, you know, and that from the evidence from the administrative decision, you know, the plaintiff's community service, community centered employment was not qualified omitted service. And that's something that I think bears on both the underlying mistake that occurred, but also whether or not Mr. Chappelle should be considered to be a good candidate for equitable estoppel in this case, because he knew as a director of the community center that they were not a qualified participating IMRF employer. In fact, he was asked questions during the administrative hearing in which he said that they considered becoming one, but it was too expensive and cost prohibitive because it wouldn't just be him becoming IMRF qualified, but all the would also have to be participating. So before he filled this form out and sought omitted service, he knew that the township, which was an IMRF qualified employer, but he also knew that the community center was not. As I said, excuse me, Mr. Deedy, he also knew that he was not being that he's the one that filled the form out and gave it to the supervisor. He's the one that went back and looked at his W-2s from the community center and filled out the years of service, which he was seeking to get permission from IMRF for omitted service. So there wasn't any dispute or mistake that these were somehow monies that were being paid to him as wages as an employee of the township. And in fact, his argument at the hearing really involved his claim at that time, based on some belief that was somewhat hard to understand, but he thought because of the close working relationship between the township and the community center that he somehow had, he should be considered an employee of the township for those periods of time. Again, this is not something that Mr. Chappelle disclosed to either the supervisor or to the IMRF during these discussions that he had prior to making this omitted service credit application. But I guess to address the specific issue of equitable estoppel in this case, I think it's important to remember that here the plaintiff has failed to raise this issue in the administrative hearing, unlike one of the cases cited in our briefs, the Keeley versus the Forest Park Police Pension Board case. In that case, there was clearly a presentation to the board, the pension board, that they should be equitably estopped from enforcing the normal statutory requirements. And that was something that there were findings on. The court eventually ruled against the petitioner in that case or the pensioner in that case. And then also, I think it's important to remember that there was no, you know, pre-hearing submission concerning equitable estoppel. There was no testimony from either the IMRF staff members who were supposedly involved in this decision. The supervisor who actually filled out the mistaken omitted service credit, she was not called to testify by either party or any of the parties. And so I think that, you know, the administrative review was confined to whether or not Mr. Chappelle should somehow expand the definition or the inclusion in the statutory provision. So, you know, the, but I guess the more important issue for purposes of this court is that the trial court's decision with respect to the equitable estoppel claim really isn't supported by any of the facts that are in the administrative record. And that's really what we're confined to. And, you know, there are a number of limitations on equitable estoppel being applied to municipalities. In this case, the, I think that IMRF fits within the definition of a municipality. And in the context of this, the doctrine of equitable estoppel, it's really, you know, can only be applied to a municipality in compelling or extraordinary circumstances. And it has to be something that's really to prevent the fraud or injustice. And in this case, the actual elements themselves, I don't think it would have meant at all. Counselor, do you think that there may be some injustice to the extent that at this point, the employee is no longer entitled to his service credit from Indiana? I think that Judge, and he's raised that issue in connection with his estoppel claim against, which is now remaining against the township itself. That's count two of the complaint. So there, he does have some remedies seeking damages in that case for this loss of opportunity that he had. So perhaps that's correct. But I think that in the context of this case, when it's really an equitable, you know, equitable decision, I don't think he fits into any of the elements that would permit the court to, you know, to extend equitable estoppel to prevent the IMRF from reducing his pension. Here, there was no evidence that any official person from the IMRF gave him any, took any action that he could have justifiably relied upon. The staff member that he mentions didn't have authority to decide this. He also, the township supervisor, which he mentions in plaintiff's brief, they are off that supervisors authorized to submit representations to the fund, but not authorized to make any determinations with respect to whether IMRF is going to accept or reject these omitted service credits. Again, counsel, you brought up the promissory estoppel count too. And in Judge Cohen's order, he said count two is stricken as moot because the issues were decided and the other one are final and appealable. In the event we agreed with the defendants, does this have to go back to the trial court for count two? Judge, I think it does. The reason Judge Cohen dismissed or to dismiss count two was because all the relief that he was seeking, if the court sustains position, but I think that the issue would be, and that's why we agreed to brief the administrative view count first, because that would kind of inform whether or not there had to be further proceedings with respect to the promissory estoppel claim. So you said it does have to go back. I didn't hear you at the Zoom. Yeah, I'm sorry. I'm sorry, your honor. Yes, it would have to go back for further proceedings on count two. But I guess the most important thing with respect to the estoppel claim is that I don't think based on the facts presented at the hearing, there's any indication that Mr. Chappelle had a reasonable belief that he should rely upon anything that he somehow believed that IRF had done. He knew that he didn't work for the township during these 198 months. He knew that the community center was not a participant. And, you know, he knew that this information he put on the form wasn't, you know, it didn't satisfy the terms of the actual application. I mean, he's put on some charge with at least some responsibility. He may be a layman, but you read the form and you read the statute for defining omitted service, and there shouldn't be any doubt in his mind that this was not something that he was going to be that led him to believe that somehow this was qualified. Again, no further discussion at the hearing. The staff member didn't testify. The supervisor didn't testify. And he never says that, oh, by the way, I told Mr. Parisi, who's the staff member, that the community center was not a participating employer, but I still think I was entitled to get this. There's no very full disclosure of the circumstances surrounding his application. It's very confusing. And I'm going to ask you to finish because your time's pretty much up. I think that's all I have to say with respect to the equitable stop and claim, Your Honor. Thank you very much, Mr. Marconi. Thank you. Good afternoon. May it please the court and counsel for IMRF and the township. I think I'm going to go back to 2002 because I think it's very important for both of the issues that were raised. And keep in mind that Richard Chappell had been the director of the Riverside Community Center for some 15 years. It's a small community. Everybody knows Richard Chappell. There was no dispute as to who paid his salary, where he was employed, and his duties. It then shifts over in 2002, the township started paying him. So according to Mr. Chappell's testimony, he then speaks with the IMRF representative. He, and I think he uses the word, did his homework. He went to the township supervisor and they told him that he could apply for omitted service credit. Now at that point, and it's been commented a couple times, he's a lay person. There's no question that the Riverside, or I'm sorry, the River Forest Community Center could have been a participant. And they said, yes, you are, you can apply for omitted service credit. So there's a lot of steps that happened then. Mr. Chappell testified that he spoke with Mr. Parisi, not just to ask him about forms, but told him what his history was and gave him the facts. Veronica Krawcik, who was the supervisor, knew Mr. Chappell. And that's when he started the process. And this process was a very long process. Is it true that when he was the director, or whatever his title was at the center, that he chose not to become a member of the pension fund because of the cost? My understanding of his testimony was, is that he could not alone become a member. In order for him to be a member, the entire River Forest Community Center would have to enroll. And I believe he used the words cost prohibitive at that time. So there was a decision made at some point where they weren't going to enroll all the employees who were with the River Forest Community Center. So if the community center had done that in 2000 or 2001, they would have become a participating member, correct? Yes. Okay. So up until 2002, when he went on River Forest's payroll, he knew that he was getting paid by an entity that was not participating in the IMRF, correct? Correct. Okay. And he knew that he would be getting no pension benefits at that time, because he was not a member of it. Correct. Which is why I think he set up a tax deferred retirement account. Absolutely. Smart move on his part. But this all goes to his of the fund. Then when he got employed by River Forest, he became a member, an employee of an employer participant, right? Correct. And at that time, because he was an employee of a participating member, he inquired whether he could get a past service credit for all the period of time he worked for the Civic Center. And he knew that the Civic Center was never a member of the IMRF. Correct. Okay. Correct. Which is I think why he said he did his homework. And I think it also shows that in his mind, they're telling him, yes, you can apply for this. And I can understand how that could happen, because I think there was a wrong interpretation of the pension code at the time, where perhaps IMRF and the town supervisor thought, look, you could have participated, you didn't. So as long as you pay your contributions for those 16 years, you could get the IMRF credit. So I think it was a mistake. Is there any statutory authority for doing that? To grant past service credit to someone who was working for some entity that could have been but was not a participating member of the fund? Is there any statutory authority to do that? I'm not aware of any statutory authority. Otherwise, obviously, that would have been raised during the administrative hearing. So I think this is, it's like a Rossler case, there was no statutory authority to allow him to get 20 years of creditable service. But because somebody told him that he could get to 20 years, because he took a leave from the police department, that case was decided on the two issues. In this case, number one, that the pension board lacked the jurisdiction in order to revisit. And number two, that he detrimentally relied upon their representation that he had his 20 years in. So in this case, I think if you look further, what IMRF does is they go ahead and they process everything. They tell him, you can get the admitted service credit. So what happens is, Mr. Chappelle, who was smart and setting up a retirement account, that $38,000 gets transferred over to IMRF. That money is now gone. He doesn't get interest on it. Let me interrupt you. Is it gone? It's taken from him in 2002 dollars. Well, let me ask you, is it gone? Wasn't that money repaid to him over the last five years? No, it was, they took it as a quote, unquote, overpayment. But that's $38,000 that could have been sitting in a tax deferred retirement account for all that time and be sitting in it into the future whenever he needs it. Well, correct. But it was repaid to him over time through his pension payments. In the last couple of years he received, well, through the overpayment, it was a reimbursement dollar for dollar. Right. And they overpaid him to the extent of 7,000 plus dollars. In other words, over the five years they paid him X dollars and $3,000 a month, right? Correct. And part of that $3,000 came out of the $37,000 he originally paid for his past service credit. Right. Okay. So that was given back to him as his contribution. But they was given back to him dollar for dollar back in 2002 dollars. I mean, had he left that money in there, it could have, would have quadrupled even more than that. So he lost out on- Morgan could have lost it all in 2008 recession. I mean, who knows? Well, I mean, it's not part of the record, but he wouldn't. I mean, what he, the small amount he had left in there quadrupled. So he lost that part of it. You had 15 years where he was retirement planning under the assumption that he was going to get $3,000 a month. Now that was cut by almost two thirds, I think like 60%. So it went from around 3,000 to 1,000. So I think he's, he suffered a terrible loss, not because of anything he did. I mean, he did his homework. He was a smart guy. He went to these people and he said, look, can I, am I entitled to this? And I'm not even so sure it was his idea in the first place. It could have came from Mr. Parisi or the township president, but I don't think he was trying to hide anything. And I think he was trying to do the right thing and they misled him. And when you fast forward 18 years now, you know, where his retirement annuity is drastically slashed, all that money in that account is gone. And I think there's, there's another issue too. And you, you've not mentioned it yet. I discussed it with councilor earlier is that the funds that he has in the Indiana fund could have been transferred. He could have bought, used that to buy credit and have that added to his pension, but he didn't take advantage of that simply because he thought that based upon what you argue is that information from both IMRF and from the township that he didn't need to do that. Right. I mean, he went in and said, all right, give me a number for my Indiana time. Give me a number for my IMRF time. He bought 16 years for like 38 grand. And I want to say it was six years at the park district. It was going to be like 50,000. His testimony was I couldn't afford to do both. If I'm going to roll over my tax deferred, I'm going to roll it over obviously for the IMRF time because you're getting a lot more time and it's less money. So the problem now is, is that he is no longer working for an IMRF employer. So it is legally impossible for him now to go back and to buy that time from Indiana. Yes. However, however, if he was employed by a participating employer tomorrow, he could get past service credit at an increased price for the Indiana time. He didn't lose that forever. I think theoretically, I don't know if there's any time limits. Sometimes I know you have to go back for a certain amount of time and then you could buy back the time. I don't know what amount. I'm thinking if it was 50 grand in 2002, it's going to be a lot higher figure. 2020, 2022, whenever he, my point is he can still do it, but it'll be more expensive. Yeah. There's also he's in the law on how much time you have to work before you can buy the time back. And there was a previous, you just had to work one day, but I think that's been changed. I know with cook County, he can still do it. If he qualifies under the statute, that's my only point it's forever. I don't think, well, time will tell. I mean, theoretically he can go back, but he's 65 years old and he needs to go find a job at an IMRF employer. Yeah. But Mr. McConnell, let me address a different issue here that the, um, Mr. Chappelle, when he filled out the forms, he listed his correct employer, which was the, um, the, the, uh, the center, but he used the taxpayer identification number of the township. And I'm assuming your argument is that was just a mistake. No, I don't think it's a mistake. That's what he was told to put down because that was the employer number. So you got to keep in mind, he did two things. He, he enrolled in IMRF. That was the IMRF number. And then he also had to fill out a separate application for the immediate service credit. So they told him to put that IMRF number, but again, he listed his correct to put that. Um, I believe Mr. Parisi or Mr. Ms. Causek, cause they were the ones helping them with the forms and looking over the forms. And that's why, uh, Veronica Causek, when she signed the form, she knew full well that he was not an employee technically of the township for those 15 years. She knew that. And then, and so that information was in there. It wasn't something that took anyone by surprise. Um, there was no, everybody knew Dick Chappelle back there and knew where he worked. Um, you know, it just asked for, for the, uh, IMRF number and that was an accurate number, but he, but he listed the salary and, and the, um, um, the correct name of the employer that he's seeking the immediate service credit for certified to the IMRF that the records of the township. I don't think the form was that specific. I think it, it, she swore to the fact that the salaries were accurate and it, and, and was for the period in which the emitted service credit was sought. Um, but I don't think it was that specific where it said these, uh, these salaries or the salary listed in the form was from earnings from River Forest Township. Well, I think the language of the certification essentially said, I certify that the records of my township, my government participating employer conform or confirm the salaries that he said he was getting. And he was never paid by the township for those 25 years or so. Correct. I just don't think the certification was that specific. It was just asking if those were accurate salaries, which they were, but the salary was from the River Forest Community Center. If I could ask you to, you had said everyone knows Mr. Chappelle. Um, and that's a council. I think Mr. Shaluga was talking about, if I mispronounce your name, I apologize, uh, was, uh, talking about the difference between the police and fire pension board precedents. And, and this, would you address that for us, please? Sure. Um, Article three and Article four funds generally are made up of usually have two people from the department, one retired person, two people from the community. So obviously they're smaller pension boards. They're single employer pension boards. Um, I am RF is more of a lot. It's obviously a larger organization that, that monitors or, um, administer the various funds through with the River Forest Township. Um, so this wasn't a case where they just were in an Island together and they were just going to throw in this application. And then somebody down in headquarters and IMRF reviewed it. So I think that it was given as much attention as it would have been on, in an Article three or an Article four fund. Um, maybe even more so in this case, because there were so many people that put their hands on this case as it went through the process. And then ultimately the pet, the board of trustees, after looking at all this, um, evidence and all of everything they had in their file, approved the benefit. Um, and I think that that, I think the law is pretty clear that if the, if the board of trustees makes a determination, renders a decision, they can't come back 15 years later and say, oops, um, we didn't, we didn't do our job. And I, I think that it, and I think it was the trial court call from Rosler and I'll say from Rosler to conclude that section three dash 1442 can be failed to verify the accuracy of the information on which based decision, what only circumvented review law, but would leave pensioners recipients uncertain as to their entitlement to benefits, despite the fact they relied on the judgment of the pension board. I think that that quote is applies in this case because you have a situation where the board of trustees made their decision to give him a certain benefit, made a decision to give him 29 years of credit. And now, you know, some 18 years later or 15 years later, they say, oops, I guess we didn't check close enough. And I don't think that's the type of mistake, um, or air that's talked about in Rosler and some of the article three funds, where they talk about an arithmetical mistake. But, but I think this was the type of, and I don't even like to call it an arrow, call it a mistake that they went back in time, 2002, and everybody said, I think he can get it. And he's like, all right, fine. I'll pay the money in and that's it. So I think, I think in that respect, I mean, I get it that somebody didn't do their homework. Somebody, I am a ref anyone and I'm a ref probably could have went on the computer and put RFCC or river forest community center or talk to Mr. Parisi and said, no, no, this is not a participating instrumentality, very easy to check. And then it goes for 15 years until the board of trustees, you know, as issues it's statement of benefits. And it says, this is what you've earned. Um, so I think very, very clearly in this particular case. And again, the other thing I want to bring up too, is this is a very individualized case. And I think there was a case that recently came down to Jesus, uh, with the policeman's annuity and benefit fund, where they were looking at two circumstances where they weren't going to apply the 35 day statute of limitations. And that's when you had a systematic underpayment or overpayment, or if somebody was attacking a resolution ordinance such as that. And that's like with the Coleman case and the billet case, you have to remember those villages enacted resolutions to take a independent contractor and make them into an employee just for the sole purpose of getting them coverage under IMRF. And that's much different here. I mean, we're not talking about any ordinance. Nobody tried to pull a fast one back in 2002 to make Richard Chappelle, um, a beneficiary or new and Newton under IMRF. They just didn't do their homework. The question now is in 2020, who pays for that? Is it Richard Chappelle who tried to do the right thing back in 2002 and go to all these people and talk to them, did everything they asked them to do, or is it going to be the township who made the mistake in the first place? Because it's my understanding that the township is probably going to have to bear the cost, the extra cost of the, of the retirement pension. Um, that's not really a cost borne by IMRF. Okay. Thank you very much. Thank you. Uh, rebuttal. Yeah. Um, you want to go first? I'll go first. Let me just address what I think is one of the fundamental problems with the, what Mr. Marconi has said is that what he said isn't in the record. Okay. There's no testimony what Mr. Parisi talked about from Mr. Parisi. It's a very generalized description. If you look at Mr. Chappelle's testimony, he doesn't ever say, I told them everything. And this is what he told me to do. He never said, Oh, by the way, I told them that we were forced community center could have been, uh, participating, but they chose not to. And I think that I should get to qualify. That's not what he testified to. Again, plaintiff has the burden here. They didn't call Mr. Parisi to find out what Mr. Parisi says about these conversations. They didn't call the supervisor that he's now a former supervisor of township, but she was still around and he could have called her for the hearing and chose not to. I mean, it's his burden. And if he really thought that there was all this evidence that he was just trying to do the right thing, it should be in the record and it's not. And the fact of the matter is with respect to the matter that I think justice Walker raised, you know, if you look at the form and also justice Pierce, the form is pretty clear. The form doesn't say what he said. It says specifically, you have to certify that the government records reflect that he earned this much money. And that's the supervisor for the township saying that he earned this money as a township employee. He also look at his application. He never actually says river forest community center. What he says, he puts it initials in. He was the executive director of the river forest civic center, which was the building. And then he puts us as former employer, our FCC river forest community center or river forest civic center doesn't really make it very clear. And I guess the, to the other point that was raised this, the IMRF code specific to the township is it doesn't belong on that form. What belongs in that form is the IMRF number for the part of the prior employer for whom he's service credit for. Again, there's no evidence in the record that Veronica Krause told him to put that number in or that Paul Parisi told him to put that number in the evidence is that he decided to put that number in because guess what? The only way he could get this approved was to make it look like the community center and the civic center and the township are all one thing. And again, it was his burden to show that somehow he was misled. And there's no evidence in the court. Counsel, if the trial court decision were to stand, who would bear the cost? Would that be a cost for by the township or would it be bored by IMR? It's going to be born by the township under a schedule that they're going to have to increase their, uh, their contributions on an annual basis to pay for Mr. Because that was money that was never paid for by anybody. Normally, it should have been paid by the community center and they didn't give those employer contributions at the same time. So now the township has the burden. And again, this is public funds that are going to be spent on this with respect to Mr. Chappelle's pension, but it's going to be over the next 20 years, it's going to be an additional cost that the township is going to have to pay out of taxpayer money. Okay. Thank you, Mr. Shaliga. Thank you, Your Honor. Um, I do want to echo what counsel just said. There were several representations by Mr. Marconi that simply don't align with the record. In this case, the notion that, uh, the idea for omitted service credit came from IMRF. That's nowhere to be found in the record. Um, it doesn't support any sort of best practice that we have. IMRF certainly wouldn't be in the position to recommend omitted service credit to someone. So that's completely outside of the record. Um, and the kind of just the narrative that everyone knew exactly what was going on. I think, again, it highlights the distinction between an article three, article four fund versus IMRF. Uh, Mr. Marconi was talking about everyone in the community. Um, IMRF has eight field representatives for 3000 employers. Um, so the notion that, Mr. Parisi was hands-on walking everyone through every single enrollment omitted service credit application, you know, every part of this process is simply, uh, it's, it's impossible. That's why, that's why the legislature included the authorized agent in the statute for administering IMRF. So if, if by everyone, Mr. Marconi means everyone other than IMRF, I have no reason to dispute that again, IMRF was relying on the representations of Mr. Chappelle and the township supervisor. Um, so I want that to be very clear. Additionally, at the very beginning of Mr. Marconi's argument, he noted that 15 years ago, there was this wrong interpretation of the pension code, where if he just paid the contributions because he, because he could have been in, um, then, then it was fine. Again, there's no evidence of that in the record. That's never been a position of IMRF. The statute is very clear with regard to omitted service credit. You can't get omitted service credit from an employer who isn't participating. Um, so again, I think there were some liberties taken with what's in, uh, what's in the record. Um, Mr. Marconi also noted that, you know, it would have been easy to verify if they just typed in River Forest Community Center in the internet, you would have found out, you know, it's not an IMRF participating employer and it would have been a done deal. IMRF didn't do its homework, but the process for, for enrollment and the process for omitted service credit, and it's not exactly how it works, right? So these forms were submitted by the employer, certified by the employer. The only way they could have gotten to IMRF is through the township certifying them. So there wasn't an analysis of what employer is this for the employer put on the form. He was an employee of the township. So that's the representation that it was based on. And finally, I'll close with, you know, who would bear the cost if the circuit court's decision was affirmed regardless of, you know, any equitable harms or who was right, who was wrong. I think it's statutorily clear that he wasn't entitled to the omitted service credit. So if there's a remedy, the remedy can't be an enhanced annuity from IMRF for the rest of his life. And the cost would not be borne solely by the township because pension, because pensions are funded by three sources, employee, employee contributions, employer contributions, and IMRF investment returns. So at least a portion of his pension would be paid by IMRF investment returns, meaning they could not be applied to other rightfully earned and rightfully qualified pension benefits. If there's a remedy where he was misled by the township, that remedy is not an IMRF pension. There are alternative theories that he can pursue against the township, but I want to emphasize the appropriate remedy is not a perpetual inflated pension. Thank you. All right. Thank you very much. Great job. The briefs and the arguments were great. We really appreciate it. And you'll be hearing from us.